## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CIAIRRA HOAG, | ) | CASE NO. 1:18-cv-02842 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Ciarra Hoag, ("Plaintiff" or "Hoag"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for

Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and

XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

### I.  PROCEDURAL HISTORY

On May 24, 2016, Hoag filed an application for DIB and SSI, alleging a disability onset date

_____

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

of May 1, 2014,  and claiming she was disabled due to lower back problems and diabetes. (Transcript ("Tr.") 142, 146, 174.)  The applications were denied initially and upon reconsideration, and Hoag requested a hearing before an administrative law judge ("ALJ").  (Tr. 85, 88.)

On January 23, 2018, an ALJ held a hearing, during which Hoag, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 24-42.)  On May 2, 2018, the ALJ issued a written decision finding Hoag was not disabled.  (Tr. 12-19.)  The ALJ's decision became final on October 11, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On December 11, 2018, Hoag filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 14, 16.) Hoag asserts the following assignments of error:

> 1.  The ALJ's evaluation of Hoag's pain failed to meet the requirements of SSR 16-3p.
>     a.  The ALJ failed to consider the impact of Hoag's obesity at Steps IV and V of the sequential evaluation process.
>     b.  The ALJ's finding that the intensity, persistence and limiting effects of Hoag's pain was not consistent with the medical evidence and was not supported by substantial evidence because he failed to consider the record as a whole in reaching that conclusion.  The ALJ also ignored relevant evidence and did not provide a rationale why that evidence was discounted.
>
> 2.  The ALJ's determination of residual functional capacity ("RFC") does not accurately portray Hoag, and is not supported by substantial evidence.

(Doc. No. 13.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Hoag was born in November 1987 and was 26 years-old at the time of her administrative hearing, making her a "younger" person under Social Security regulations.  (Tr. 18.)  *See* 20 C.F.R.

§§ 404.1563.  She did not complete high school but received a GED and is able to communicate in English.  (Tr. 27.)  She has past relevant work as a store clerk and fast food restaurant worker.  (Tr. 175.)

**B.     Relevant Medical Evidence[2]**

Hoag's diagnosed impairments are degenerative disc disease, obesity, diabetes and asthma. (Tr. 15.)  Her degenerative disc disease includes spondylosis and spondylolisthesis at the L5 vertebrae, and foraminal stenosis, as well as degenerative changes. (Tr. 278.)

Hoag claims her disability began on May 1, 2014, when difficulties with her first pregnancy made it "harder and harder" to stand and walk, causing her to resign from her job as a McDonald's crew member.  (Tr. 27.)  She suffered from back pain and gestational diabetes during that pregnancy. (Tr. 645.)

After delivering her son, Hoag continued to have "significant low back pain."  (Tr. 740.) During her pregnancy, Dr. Kovach, her obstetrician-gynecologist, had prescribed pain medication, and post-pregnancy she continued to seek help with her pain.  (*Id.*)

After her pregnancy, she saw Dr. Martin Dufour as her primary care provider, and received pain management services through the Cleveland Clinic. (Tr. 735.)  She explained that she had experienced back pain for 11 years, but pregnancy and delivery had made her pain worse.  (Tr. 819.) Dr. Dufour prescribed Tramadol and Norco for her pain, and also ordered x-rays and an MRI to investigate its underlying cause.  (Tr. 809, 815, 820.)

Hoag had x-rays on February 19, 2015, and an MRI on June 4, 2015, revealing a grade I

---

[2]     The Court notes its recitation of the evidence is not intended to be exhaustive and is limited to the evidence cited in the Parties' briefs.

spondylolithesis with bilateral pars defects, resulting in bilateral foraminal stenosis at L5-S1, with minimal degenerative spurring.  (Tr. 323-5.)  Based on these assessments, in August of 2015, Dr. Dufour referred her to Dr. Domingo Gonzalez, a neurologist. (Tr. 369.)  He confirmed the MRI findings and noted that she had completed three months of physical therapy at the Cleveland Clinic with no improvement.  (*Id.*)  Since both physical therapy and pain management had failed, Dr. Gonzalez recommended that Hoag consider surgery.  (*Id.*)

Dr. Gale Hazen, a neurologic surgeon, evaluated Hoag on September 3, 2015.  (Tr. 325.) His records indicate that Hoag reported significant pain, such that "She cannot even take care of her baby. She cannot work.  She cannot sit.  She cannot stand.  She cannot do very much because of the low back pain." (*Id.*)  Yet, at the same appointment, Dr. Hazen observed, "She is able to get up and walk fairly well.  She has good strength for the major muscle groups in the lower extremities."  (*Id.*)  He explained that Hoag was a candidate for surgery, but that "weight loss would be very important" in determining the appropriate surgical intervention, and asked Hoag to attempt to reduce her weight from 270 pound to 240 pounds.  (*Id.*)

On December 3, 2015, Hoag returned to Dr. Hazen for her scheduled follow-up visit.  (Tr. 330.)  Her surgery was delayed because "she needed to lose twenty to twenty-five pounds and her hemoglobin would need to be more normal which may take several months."  (*Id.*)  At this point, Hazen's records reflect that Hoag had "tried physical therapy, pain management," and "had nerve blocks," but "nothing helps."  (*Id.*)

Hoag returned to Dr. Hazen a third time on April 14, 2016.  (Tr. 335-336.)  Her back pain was essentially unchanged, and she was about three months pregnant.  (Tr. 336.)  Surgery was no longer a treatment option until after the delivery of her baby.  (*Id.*)

4

On November 17, 2016, Hoag returned to Dr. Hazen for a fourth time, still in pain but twenty pounds lighter, at 251 pounds, and no longer pregnant, having delivered her second son.  (Tr. 736.) Dr. Hazen determined that Hoag "meets all the criteria for surgery as she has instability, congenital spondylosis with spondylolisthesis and significant back pain that has not improved with therapy and pain management including injections."  (*Id.*)  He noted that "she is able to get up.  She can walk on toe walk and heel walk.  She does have pain with any range of motion."  (Tr. 741.)

Dr. Sanjay Kumar evaluated Hoag on December 21, 2016, at Dr. Hazen's request. (Tr. 742.) By this time, she had regained 8 pounds, and weighed 259 pounds.  (Tr. 744.) Dr. Kumar noted that Hoag had experienced back pain "for about seven years," was obese and experienced sleep disturbance.  (Tr. 742.)  He also observed that her strength was "functional for ambulation, balance functional, coordination normal," although she had an "antalgic gait." (Tr. 745.)  He continued Hoag's prescription for Ultram because it was allowing her to "function, clean house, do chores, etc." (Tr. 745.)

On January 1, 2017, Hoag saw Caryn Delisio, NP, seeking help with her back pain.  (Tr. 748.) Nurse Delisio noted her decreased range of movement and tenderness to palpitation, and renewed her Tramadol prescription. (Tr. 750.)

On February 1, 2017, Dr. Hazen and Dr. Andrasko performed the recommended surgery: a left retroperineal anterior L5-S1 diskectomy, interbody fusion.  (Tr. 734.)  The medical records note that Hoag was, at the time, "non-morbidly obese," which made the surgery more difficult.  (Tr. 734.)

On February 15, 2017, Hoag saw Dr. Kumar for a post-surgical followup.  (Tr. 759.)  He viewed the surgery as successful, but observed she was walking with the aid of a walker, and still experiencing "some numbness in the left thigh, a lot of back pain," for which she was taking 10 mg

5

of Percocet every 4 hours as well as some Tramadol.  (*Id.*)  He also observed she exhibited "decreased range of motion, pain and spasm" in her back. (Tr. 761.)

Hoag also began physical therapy post-surgery.  Kevin Dusenbury, PT, initially observed she had "functional range of motion in the lower extremities," and judged her to be "progressing well." (Tr. 766.)  But at her second appointment, he noted that she reported feeling "worse since surgery." (Tr. 768.)

Hoag saw Dr. Hazen on March 2, 2017, and he reported that "the spondylolisthesis is about the same unchanged," but "her implant is in excellent position."  (Tr. 773.)  She was "able to get up independently without the walker," and "support her weight on both heel walk and toe walk."  (*Id.*)

Hoag reported to the Nurse Practitioner monitoring her recovery that her pain level with medication was "2/10" and "'20/10' without medication" on March 15, 2017.  (Tr. 776.)  Her weight also kept climbing, reaching 270 pounds by mid-March.  (*Id.*)

On May 11, 2017, Hoag again returned to see Dr. Hazen "because she is not good.  She has back spasms beginning in her lower back going all the way up to the neck.  She has some numbness in her lower left extremity. . . . Bending and standing hurt."  (Tr. 782.)

By June 15, 2017, Hoag was reporting pain levels of 8/10 with medication, and 10/10 without medication.  (Tr. 785.)  The nurse who examined her noted her "decreased [range of motion] with flexion and extension of lower back," as well as tenderness in the lumbar area and tight hamstrings. (Tr. 786.)

On July 19, 2017, Hoag reported a lower pain level with medication of "4/10."  (Tr. 788.) Dr. Kumar, who examined her, noted in her records that "She has chronic pain and spasms.  She is frustrated with the pain.  Achy pain."  (*Id.*)   He continued her medications, including Percocet, and

discussed weaning her off them. (*Id.*)  He suggested a nerve branch block to help alleviate the pain. (*Id.*)

Hoag returned to the doctor for medication follow-ups in August and September 2017. (Tr. 793, 798.)  Each time, she reported pain levels of "4-5/10" with medication, and "10/10 " without medication, explaining "medication helps her function and improves her quality of life." (Tr. 795, 800.) Each time, her providers noted, "[patient] feels her medication helps her function and improves her quality of life," and her medications were continued. (*Id.*)  At the September appointment, she was prescribed gabapentin for leg spasms and the doctor recommended radio frequency ablation to treat her pain. (Tr. 801-802.)

Hoag's obesity is detailed throughout the medical record. (Tr. 241, 322-336, 333-335, 368, 734, 736, 754, 759, 764-766, 766, 772-773, 774, 783, 793, 795-796, 796, 801, 806, 808, 831-832). The records make clear her obesity and back pain impacted each other.  Her back pain led to inactivity that worsened her obesity. (Tr. 325.) Her obesity complicated treatment for her back pain, contributing to a delay in scheduling the recommended lumbar surgery. (Tr. 325, 330, 335-6, 740, 806.)

## C.    State Agency Reports

State Agency reviewer Leslie Green, M.D., reviewed the file as constituted on July 26, 2016. (Tr. 49.)  She found that Hoag had medically determinable impairments including spine disorders, diabetes and obesity. (Tr. 55.)  She also found that Hoag's statements regarding her symptoms were "fully consistent" with the evidence in her file, noting "objective evidence shows that she has difficulty sitting or standing [due to] back pain.  However, she is able to walk fairly well." (Tr. 56.) Her report contains internal contradictions, as, on the same page, she concluded that Hoag could

7

stand or walk for about 6 hours in an 8-hour workday, and also that she was limited to standing 2 out of 8 hours.  (Tr. 57.)  She found Hoag capable of light work.  (*Id.*)

State Agency reviewer Teresita Cruz, M.D., reviewed the file as constituted on October 24, 2016, and concurred entirely with the findings of Dr. Green, including the contradictory findings. (Tr. 66-69.)

**D.    Hearing Testimony**

During the January 8, 2018, administrative hearing, Hoag testified to the following:

- She is 30 years old.  (Tr. 27.)

- She has received her GED.  (Tr. 27.)

- She previously worked as a Dairy Mart clerk and a McDonald's crew member.  (Tr. 27.)

- She is 5 feet 8 inches tall and weighs 270 pounds.  (Tr. 29.)

- Her back problems became disabling during her first pregnancy.  After the birth of her son, the pain continued, so she sought medical help.  (Tr. 28.)

- She experiences back pain that she rates as a level 5 on a scale of 1-10, and manages this pain with medication including Percocet, Tramadol and Gabapentin. (Tr. 28.)

- She has undergone back surgery, but this "made things worse." (Tr. 28, 33.)

- She has tried physical therapy, but this also made the pain worse.  (Tr. 33.)

- She took medication on the day of the hearing, and rated her pain at a 5 on a scale of 1-10.  (Tr. 28.)

- Her pain limits her to sitting in a chair for 20-30 minutes at most  (Tr. 32.)

- She can lift up to 5 pounds.  (Tr 35.)

- To assist with mobility, she occasionally uses a walker (Tr. 36), or an electric cart at the grocery store (Tr. 33), but has not been approved for a cane. (Tr. 36.)

8

- To manage her pain, she usually sits in a partially reclined position, with her feet slightly elevated, because "if I sit too long in an upright position, it hurts pretty good and if I'm too far back it hurts."  (Tr. 32.)

- When standing, she "kind of always" wants to hold onto something, because "my legs will give out without any types of notice."  (Tr. 33.)

- She cannot lift or carry her young children, and relies on her husband, a friend and her mother-in-law to cook, provide childcare and perform most household tasks. (Tr. 29, 31-32.)

- With the aid of her medication, she can sit on the floor and play with her children. (Tr. 32.)

- Her housekeeping is limited to vacuuming, and she is "not able to move too much for a long period of time," and is unable to do simple things, such as "bend like I used to . . . . stand and walk like I used to, I can't pick up my kids which I was able to do before the surgery.  Just little things like being able to cook dinner I was able to do before the surgery." (Tr. 30-31.)

- She does not drive or have a driver's license.  (Tr. 34-35.)

- She uses a rescue inhaler for her asthma, and has not been able to quit smoking. (Tr. 29-30.)

The VE testified that Hoag had past work as a store clerk and fast food restaurant worker. (Tr. 38.)  The ALJ then posed the following hypothetical question: Could an individual of the same age, education and vocational profile as Hoag be employable if that individual could: lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand or walk for 4 hours in an 8-hour workday; sit 6 out of 8 hours; occasionally use a ramp or stairs, but never climb a rope, ladder or scaffold; frequently balance; occasionally stoop, kneel, crouch and crawl; also presuming that individual should avoid high concentrations of smoke, fumes and dust; and entirely avoid dangerous machinery at unprotected heights.  (Tr. 38.)

The VE testified the hypothetical individual would not be able to perform Hoag's past work

9

as store clerk or fast food worker.  (*Id*.)  The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as office helper, mail clerk and information clerk.  (Tr. 39.)

The ALJ next altered the hypothetical by reducing the amount of the standing time to 2 out of 8 hours.  (Tr. 39.)  The VE testified the hypothetical individual would still not be able to perform Hoag's past work, but could perform jobs such as food and beverage order clerk, charge account clerk and document preparer.  (Tr. 39-40.)

On cross examination, Plaintiff's counsel asked the VE to amend the hypothetical to consider a person with the same limitations who also had to lean back in a chair to elevate their legs. (Tr. 40.) The VE responded that if the person could not get their hands out in front of them from the reclined position, there would be no job that person would be able to do. (Tr. 41.)  Plaintiff's counsel also asked if the individual in the second hypothetical would be able to do the jobs the VE identified if they also required the use of an assistive device for standing and walking one or two days a month. (*Id.*)  The VE responded that they could not do those jobs unless they were able to stand and walk independently.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Hoag was insured on her alleged disability onset date, May 1, 2014, and remained

11

insured through December 31, 2017, her date last insured ("DLI.") (Tr. 14.)  Therefore, in order to be entitled to DIB, Hoag must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.    The claimant has not engaged in substantial gainful activity since May 1, 2014, the alleged onset date. (20 C.F.R. 404.1571 *et seq.,* and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine and obesity (20 C.F.R. 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    The claimant has the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she can only stand for 4 hours of an 8-hour work day; can never climb ropes, ladders or scaffold; can occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; can frequently balance; must avoid high concentrations of smoke, fumes, pollutants and dust; and cannot be exposed to dangerous machinery and unprotected heights.

6.    The claimant is unable to perform any past relevant work. (20 C.F.R. 404.1565 and 416.965).

7.    The claimant was born in November 9, 1987, and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

12

8.      The claimant has at least a high school education, and is able to communicate in English.  (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.  (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (20 CFR 404.1569, 404.11569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2014, though May 2, 2018, the date of the ALJ's decision.  (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-19.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v.*

13

*Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant

14

evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

*McHugh v. Astrue*, No. 1:10-CV-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-

CV-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    The Evaluation of Hoag's Pain is Consistent with SSR 16-3p

It is well-settled that pain alone, if caused by a medical impairment, may be severe enough

to constitute a disability.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir.

1981), cert. denied, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).  When a claimant alleges

a symptom so severe that it is disabling, SSR 16-3p instructs the ALJ to follow a two-step process

for evaluating these symptoms.  *See, e.g, Massey v. Comm'r of Soc. Sec.*, No. 09-6527, 2011 WL

383254 at * 3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying

medically determinable physical or mental impairment that could reasonably be expected to produce

a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the

claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's]

capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[3] 2016 WL 1119029 (March

16, 2016).  This test applies to cases where the alleged symptom is pain, as the Commissioner must

(1) examine whether the objective medical evidence supports a finding of an underlying medical

condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain

arising from the condition or whether the objectively established medical condition is of such a

---

[3]     SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28,
        2016.  Thus, SSR 16-3 was in effect at the time of the January 23, 2018 hearing.

severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038 39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. App'x 828, 834 (6th Cir. June 2005).

Here, there is no dispute regarding the first step of the test, as the ALJ found that Hoag's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 16.)  Despite this finding, he rejected her claim of disability because he found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*)

Hoag alleges that the ALJ's evaluation of the intensity, persistence and limiting effects of her pain failed to meet the requirements of SSR 16-3p for two reasons. First, Hoag alleges that the ALJ failed to consider the impact of Hoag's obesity at Steps Four and Five of the sequential evaluation process, as required under SSR 02-1p. (Doc. No. 13 at 12-14.)  Second, Hoag alleges that the ALJ failed to consider the record as a whole and ignored relevant evidence in reaching that conclusion.  (*Id.* at 14-19.)

The Commissioner disputes this characterization of the ALJ's opinion.  He points out that the ALJ acknowledged Hoag's obesity and that he stated that he analyzed the effect her obesity had in combination with her other impairments "[p]ursuant to Social Security Ruling 02-1p."  (Doc. No. 14 at 8, citing Tr. 15.)   He also notes that the state doctors both included Hoag's obesity in their analysis and determined she was capable of light work.  (*Id.* citing Tr. 46, 48, 49, 67-69.)

### 1. **The ALJ Considered the Impact of Hoag's Obesity on Her Functioning**

SSR 02-1p directs the ALJ to assess the effect obesity has upon the individual's ability to

perform routine movement and necessary physical activity within the work environment." SSR 02-1p at 6, *see also Shilo v. Comm'r of Soc. Sec.*, 600 Fed. App'x. 956, 959 (6th Cir. 2015). It acknowledges that obesity may increase the severity of other limitations, and directs that the ALJ "will explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." SSR 02-1p at 6. The regulation "does not identify a specific method of analysis," but does provide "detailed interpretive guidelines." *Norman v. Astrue*, 674 F. Supp. 2d 738, 748-49 (N.D. Ohio 2010).

The ALJ in this case acknowledged Hoag's obesity at Step Four of his analysis, and even referenced SSR 02-1p, stating that he "considered the claimant's obesity, in combination with the claimant's other impairments, to determine if a listing was met or equaled," and determined that, "evidence in the instant case does not establish that the claimant's obesity causes any other impairment to meet or medically equal a listing." (Tr. 15.) He again raised the issue of Hoag's obesity in his Step Five analysis, noting that "[t]he claimant's obesity is documented throughout the record," and citing to some of those documents. (Tr. 15.)

This case is distinct from two of the cases cited by Hoag, where the courts remanded due to an insufficient analysis under SSR 02-1p, because in those cases the ALJ appeared to make prejudicial inferences about the claimants' characters based on their obesity. In *Shilo v. Commissioner of Social Security*, 600 Fed. Appx. 956 (6th Cir. 2015), the court's remand was partially based on its conclusion that "the ALJ improperly concluded that Shilo could and should be penalized for failing to follow his doctor's instructions to lose weight," which is expressly contradicted by SSR 02-1p. *Id.* at 963. Similarly, in *Norman v. Astrue*, 674 F. Supp. 2d 738 (N.D. Ohio 2010), the court's decision to remand was influenced by its observation that, "the ALJ appears

17

to have discounted or discredited Norman's back pain allegations because he is obese, rather than evaluate whether his obesity exacerbates his back problems." *Id.* at 749.

Hoag does not allege such a bias on the part of the ALJ, nor does his decision indicate that he drew any conclusions from her size other than that it was itself a severe impairment, and also a contributing factor in her back disease and a complicating factor in her treatment.  In his decision, the ALJ reviews the fluctuating reports of pain and impairment throughout Hoag's medical records and asserts that the evidence in the medical record is not conclusive as to the intensity, persistence and limiting effect of her pain.  (Tr. 16-17.)  He cites specific instances in the record where Hoag reports low or moderate pain with the aid of her medication, and determines that Hoag should be capable of light work with limitations.  (*Id.*)  Although a more thorough explanation would be preferable, his assessment meets the standard of minimal articulation of an assessment of the evidence.  *See Morris v. Sec'y of H.H.S.*, No. 86 5875, 1988 WL 34109 (E.D. Tenn. Apr. 18, 1988), at *2 ("a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position.")  The ALJ's decision makes it clear that he expressly considered Hoag's obesity as a factor in her disability in both Steps Four and Five of the sequential evaluation process, and nowhere in his decision does he appear to be penalizing her for this sometimes-stigmatized medical condition.  For these reasons, this Court finds that the ALJ considered Hoag's obesity and the effect of her cumulative impairments as required by the regulations.

## 2.  **The ALJ's Finding are Consistent with the Record as a Whole**

Hoag's next contention is that the ALJ's finding that the intensity, persistence and limiting effect of her pain was not consistent with the medical evidence and was not supported by substantial

18

evidence because he failed to consider the record as a whole in making his conclusion, and ignored relevant evidence without providing a rationale why that evidence was discounted. (Doc. No. 13 at 14.)

The Commissioner contends that the ALJ "conducted a very through assessment" and notes that the ALJ's Opinion indicates that he "considered Plaintiff's subjective complaints as well as the objective medical evidence, medical opinions, treatment history, activities of daily living, and her vocational background." (Doc. No. 14 at 6.) He asserts that the ALJ supported his decision with substantial evidence. (*Id.* at 10.)

The ALJ is obligated to consider the record as a whole. *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence. *Morris,* 1988 WL 34109, at *2. Otherwise, the reviewing court is unable to discern "if significant probative evidence was not credited or simply ignored." *Id*. (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). The ALJ need not provide a "written evaluation of every piece of testimony and evidence submitted. However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Id.* (quoting *Cotter*, 642 F.2d at 705). An ALJ "cannot 'pick and choose' only the evidence that supports his position." *Kester v. Astrue*, No. 3:07-CV-00423, 2009 WL 275438, at *9 (S.D. Ohio Feb. 3, 2009) (citing *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Switzer v. Heckler*, 742 F.2d 382, 385 86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 57 (S.D.N.Y. 2002)). Although an ALJ is not required to provide detailed evaluation of every piece of evidence contained within the record, they is must provide a minimal articulation of their assessment of the evidence. *See Morris*, 1988 WL

19

34109, at *2.

Moreover, an ALJ must provide a discussion at each step "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.*, No. 3:16-CV-2368,  2017 WL 3405700 at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec.*, No. 5:13-CV-2360, 2014 WL 6687227 at *10 (N.D. Ohio Nov. 26, 2014).  This discussion must "build an accurate and logical bridge between the evidence" and the ALJ's conclusion.  *Snyder*, 2014 WL 6687227 at *10 (quoting *Woodall v. Colvin*, No. 5:13-CV-1818,  2013 WL 4710516 at *10 (N.D. Ohio Aug. 29, 2013)).

Hoag bases her objection on the fact that the ALJ's opinion focuses on instances when she reported less severe pain, and does not devote much analysis to the period of time before her surgery. (Doc. No. 13 at 16-18.)  Both of these alleged errors arise logically from the ALJ's attempt to explain his determination that Hoag's pain was not disabling.

The parties agree that the medical records reflect that "Ms. Hoag's chronic pain was not static, but varied over time."  (Doc. 13 at 18.)  In his opinion, the ALJ focuses on instances when Hoag reported that her medication was successfully controlling her pain, or doctors reported her to have normal functioning.  He explains in the opinion that he is summarizing the evidence that led him to conclude that Hoag's statements regarding the intensity, persistence and limiting effect of her pain were "not entirely consistent" with the medical evidence.   This does not mean that he overlooked or ignored evidence that was consistent with severe pain.  To the contrary, he references some of that evidence specifically, including reports of pain before and after her February 1, 2017, surgery, for example:

- Pre-surgery:

20

- "The claimant denied having any back or joint pain at a May 2016 primary care visit, but did report back pain in November 2016," (Tr. 16); and

- "She said the surgery caused her pain to worse" (Tr. 17)

- Post-surgery:

  - "She did not complete her course of [post-surgery] physical therapy due to pain complaints" (Tr. 17); and

  - "In July 2017, the claimant said her pain level was 4 out of 10 with medication." (*Id.*).

Indeed, implicit in the finding of "not entirely consistent" is the acknowledgment that some evidence supports the claimant's statements. Weighing that conflicting evidence is the duty of the ALJ, and the Court cannot remand the ALJ's decision simply because conflicting evidence exists in the record. *Buxton,* 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.

It is reasonable to conclude that, by detailing instances when Hoag herself described relatively low levels of pain, the ALJ was doing exactly what he stated: giving the basis for his determination that the pain was manageable, and not disabling. Hoag frequently reported that medication was effectively controlling her pain, for example:

- Pre-surgery:

  - "pain level is about 3 or 4/10 with Ultram" (Tr. 745.)

  - "pain level with her medication is 2-3/10" (Tr. 749.)

- Post-surgery:

  - "pain level with her medication is 2/10" (Tr. 776.)

  - "pain with medication about 4/10" (Tr. 788.)

  - "pain level with her medication is 4-5/10." (Tr. 795, 800.)

21

These reports mostly used a 1-10 scale for self-reporting. Although it appears to quantify a patient's pain, such a scale is inherently subjective.  Hoag argues that the ALJ erred because he relied on Hoag's statements to providers that medication was helping her functioning and improving her quality of life, but "made no inquiry or finding about the degree of improvement or from what baseline she improved." (Doc. No. 16 at 8.)  This is contradicted by the fact that the ALJ also relied upon more objective measures of functioning within the same medical records.  The ALJ focused his evaluation on whether Hoag's impairments were disabling, and it is proper for the ALJ to give weight to Hoag's self-reported symptoms in making that determination. *See* 20 C.F.R. § 404.1529; SSR 16-p-3 *Purpose*, 2016 WL 1119029 (March 16, 2016).

Hoag also notes that the ALJ included "physical therapy and surgery" in his description of modalities that "addressed" Hoag's pain, although she consistently reported that both physical therapy and surgery had made her feel worse.  (Doc. No. 13 at 18.)  There is no evidence that physical therapy or surgery reduced Hoag's pain, but there is substantial evidence in the record that medication was effectively controlling her pain, both in her self-reports and in the fact that numerous providers continued prescribing it for that express purpose.  The conclusion that the pain medication rendered Hoag capable of light work was not inevitable, but, based on the inconsistent reports of pain and impairment throughout the record, it falls squarely within the ALJ's zone of choice.

It is also true, as Hoag points out, that the ALJ focuses his analysis on the period after Hoag's surgery. (Doc. No. 13 at 16-17.)  This, too, follows logically from the evidence in the record. Hoag herself repeatedly told her medical providers that her symptoms were worse after the surgery, for example:

- "[patient] states she seems to be worse since surgery" (Tr. 768)

22

- "She says the surgery 'made everything worse.'" (Tr. 785.)

At her hearing, she explained that "[t]he back pain before surgery, it was there. I could manage it. . . . After the surgery . . . every day I take a medication, and without the medication I don't know what I'd be able to do because it's rough and hard to do anything." (Tr. 33.)  Therefore, if Hoag was not disabled after the surgery, when she described her symptoms as being most severe and limiting, a more detailed evaluation of her pre-surgery impairments would not change the result of the ALJ's analysis.

Hoag consistently reported lower back pain, but the objective findings did not reflect significant functional limitations.  Hoag cites the fact that both of the state doctors found that, "claimant's reports of back pain are fully supported by the objective evidence in file," as evidence that the ALJ ignored relevant evidence.  (Doc. 13 at 14, citing Tr. 47, *see also* Tr. 68.)  Yet in the same reports, one state doctor explained, "The medical evidence shows that your symptoms are severe.  You are limited to light physical activity. . . . However, based on the evidence in file, we have determined that you can adjust to other work." (Tr. 51.)  The other doctor explained, "Medical evidence does show that your conditions result in some limitations.  However, you are still able to walk normally and adequately move about and use your arms and legs.  We realize that your conditions cause you discomfort, yet, they do not significantly interfere with your ability to perform all work related functions."  (Tr. 71.)  The state doctors both concluded that Hoag's physical disabilities provide a medical basis for her pain symptoms, while also making clear that they did not judge this pain to be disabling.  Thus, the state doctors' reports are consistent with the ALJ's

23

conclusions regarding that the intensity, persistence and limiting effect of Ms. Hoag's pain.[4]  For these reasons, the Court finds that the ALJ's opinion is supported by substantial evidence and consistent with the record as a whole.

### B.       The RFC is Supported by Substantial Evidence.

Hoag's final objection is based on the ALJ's reliance on the VE's testimony.  Hoag contends that the ALJ's hypothetical did not accurately reflect her limitations as described in the RFC.  (Doc. No. 13 at 19-20.)  She also disputes the ALJ's determination of her RFC, on the grounds that there is not substantial medical evidence to support it.  (*Id.*)

The Commissioner points out that his RFC includes the qualification that Hoag is qualified for light work, "as defined in 20 CFR 404.1567(b)" and argues that "his silence on a sitting limitation logically means that he accepted the sitting limitations in the definition of light work, which means the remaining time not standing or walking."  (Doc. No. 14 at 8, quoting Tr. 15.)  Both of the regulations cited in the ALJ's RFC state that "a job is in this category [of light work] when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  (*Id.*, quoting 20 CFR §§ 404.1567(b); 416.967(b).)  The Commissioner also notes that the Rulings explain that a full range of light work contemplates, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." (*Id.*, quoting

---

[4]      Although the ALJ does not specifically cite them, they are included in the record he provided.  (Tr. 43-82.)  They therefore form part of the record the Court considers on judicial review, and can serve as substantial evidence to support the ALJ's findings. (*See, e.g., Campbell v. Comm'r of Soc. Sec.*, No. 1:18-CV-01571, 2019 WL 2235995, at *2 (N.D. Ohio May 23, 2019) ("While the ALJ did not discuss or weigh the state agency reviewing physicians' opinions, they form part of the record the Court considers on judicial review.")

*Titles II & Xvi: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2*, SSR 83-10 (S.S.A. 1983).)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but rather an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[5] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination. S.S.R. 96-8p.  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

If an ALJ intends to use a VE's opinion as substantial evidence for his decision, it is important that the hypothetical presented to a VE accurately reflects a claimant's functional limitations.  *See, e.g., Ealy*, 594 F.3d at 516 ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments.") Nevertheless, if the ALJ errs on the side of creating a hypothetical more restrictive than his RFC, he can still rely on the VE's opinion, as it meets the substantial evidence standard. *See, e.g, Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 845 (6th Cir. 2005) ("[VE's] testimony was

---

[5]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

based on a hypothetical that was more favorably physically than the RFC we find supported by substantial evidence, we hold that finding an RFC different from the hypothetical given the VE was not reversible error.'); *McVey v. Comm'r of Soc*. Sec., No. 2:10-CV-231, 2012 WL 966484, at *3 (E.D. Tenn. Mar. 21, 2012) ("contrary to Plaintiff's argument that the ALJ left out relevant limitations in posing his hypothetical questions, it appears the ALJ actually imposed more, presumably making the hypotheticals even more favorable to Plaintiff than his RFC determination. After reviewing the record, this Court concludes the ALJ properly determined Plaintiff had the RFC to perform her past relevant work and his determination was supported by substantial evidence."); *Hoon v. Comm'r of Soc. Sec.*, No. 5:17-CV-10494, 2018 WL 3284460, at *3 (E.D. Mich. Feb. 26, 2018), report and recommendation adopted, No. 17-CV-10494, 2018 WL 1417603 (E.D. Mich. Mar. 22, 2018) ("As this Court has noted, 'an ALJ typically asks hypothetical questions that are more limiting than the plaintiff's ultimate RFC because the ALJ needs a broad basis under which to make a determination.'" citing *Powers v. Comm'r of Soc. Sec.*, No. 13-10575, 2014 WL 861541, at *5 (E.D. Mich. Mar. 5, 2014).

The Commissioner's argument is that  sitting time is incorporated into the definition of light work as "the remaining time not standing or walking."  Because the referenced statues incorporate the sitting limitation into his RFC, he asserts, there is no discrepancy. This is not supported by the Ruling he cites.  (Doc. No. 14 at 8, quoting Tr. 15.)  *Titles II & Xvi: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2*, SSR 83-10 (S.S.A. 1983) are explicit that the difference between sedentary work and light work is that "[r]elatively few unskilled light jobs are performed in a seated position."  It further explains, "the primary difference between sedentary and most light jobs" is that "a job is in [the light work] category when it requires a good deal of walking

26

or standing." (*Id.*)  Since the ALJ acknowledged that Hoag's previous jobs were unskilled and she had no transferrable job skills, we must conclude that he intended the RFC finding of "light work as defined in 20 CFR 404.1567(b)" to refer to unskilled light work.  (Tr. 15.)  Thus, referencing the statutory definition of "light work" does not create an implicit or explicit sitting limitation.

Although the Commissioner did not include a sitting limitation in his RFC, Hoag's objection fails because remand on this point would be futile.[6]  On remand, the ALJ would correct his error by specifying the sitting limitation in his RFC - creating a more restrictive RFC - or removing it from the hypotheticals - creating a less restrictive hypothetical.  Due to the ALJ's error, both of the hypotheticals contain more functional limitations than the RFC, making them more restrictive.  The ALJ's RFC stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except can stand and /or walk 4 hours per 8-hour workday; can never climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs, stoop, kneel, crouch or crawl; can frequently balance; must avoid high concentrations of smoke, fumes, pollutants and dust; cannot be exposed to dangerous machinery and unprotected heights.  (Tr. 15.)

The ALJ posed two hypotheticals to the VE. First he asked whether an individual of the same age, education and vocational profile as Hoag would be employable if that individual could: lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand or walk for 4 hours in an 8-hour workday; sit 6 out of 8 hours; occasionally use a ramp or stairs, but never climb a rope, ladder or

---

[6]  *N.L.R.B. v. Wyman-Gordon Co*., 394 U.S. 759, 766 n.6 (1969) ("To remand would be an idle and useless formality. Chenery does not require that we convert judicial review of agency action into a ping-pong game ... There is not the slightest uncertainty as to the outcome of a proceeding before the Board...It would be meaningless to remand."); *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 547 (6th Cir. 2004) (citing and quoting *Wyman-Gordon Co.*, 394 U.S. at 766 n.6) ).

scaffold; frequently balance; occasionally stoop, kneel, crouch and crawl; also presuming that individual should avoid high concentrations of smoke, fumes and dust; and entirely avoid dangerous machinery at unprotected heights.  (Tr. 38.)  The VE responded the hypothetical individual would be able to perform representative jobs in the economy, such as office helper, mail clerk and information clerk.  (Tr. 39.)  The ALJ then altered the hypothetical by reducing the amount of the standing time to 2 out of 8 hours.  (Tr. 39.)  The VE testified the hypothetical individual could still perform jobs such as food and beverage order clerk, charge account clerk and document preparer. (Tr. 39-40.)

The first hypothetical exactly matched the ALJ's RFC determination that Hoag could stand for 4 out of 8 hours but it added a sitting restriction: such an individual could sit for 6 out of 8 hours. (Tr. 38.)  The ALJ's RFC was silent as to sitting limitations, but they were added to the hypothetical, creating a more restrictive scenario than that presented in the RFC.

The second hypothetical the ALJ presented imagined a hypothetical individual who stood only 2 out of 8 hours - a greater functional limitation regarding standing than in his RFC - and mirrored the most restrictive findings of the state doctors, who, when asked to explain how and why they had determined Hoag's exertional limitations, asserted that Hoag was "limited to 2 of 8 hours standing and/or walking [due to] pain symptoms." (Tr. 57, 69.) It also retained the sitting limitation in the previous hypothetical.  (Tr. 39.)  The VE still determined that there were jobs available for that hypothetical individual in the national economy.  (Tr. 39-40.)

The inclusion of a sitting limitation and reduction of standing time in the second hypothetical, make the second hypothetical more restrictive than the first, which was already more restrictive than the RFC.  Where the hypothetical differs from RFC by presenting a scenario that is

more favorable to the claimant (incorporating more functional limitations that the RFC), it can still serve as substantial evidence supporting the ALJ's decision. *Hoon*, 2018 WL 3284460, at *3 ("the jobs identified in response to the more restrictive hypothetical . . . constitute substantial evidence in support of the ALJ's RFC, which is less restrictive."); *Powers*, 2014 WL 861541, at *5 ("an ALJ typically asks hypothetical questions that are more limiting than the plaintiff's ultimate RFC because the ALJ needs a broad basis under which to make a determination."). Correcting the ALJ's error so that the RFC and hypothetical match would not create an outcome more favorable to Hoag, because if the VE found her capable of performing jobs under the more restrictive hypotheticals, removing restrictions so that the hypotheticals match the RFC determination will not make her less capable of work. Therefore, despite the ALJ's error, we do not recommend remand.

Although Hoag cites evidence from the record she believes supports an RFC with an even more restrictive sitting limitation, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Here, the ALJ provided sufficiently specific reasons for finding Hoag capable of performing light work as set forth in the RFC and these reasons are supported by substantial evidence in the record.

Finally, the Court notes that in the final paragraph of her Brief on the Merits, Hoag states that the ALJ "cited no medical evidence for the support of his conclusion that she had the physical capacity to work." (Doc. No. 13 at 21.) In fact, the ALJ cited numerous treatment records, which

29

qualify as medical evidence.  She continues by noting that "the ALJ neither referenced, discussed or evaluated the state doctors' opinions."[7]  (*Id.*)  This is true, and it appears that the thrust of her complaint: that the RFC is not based on a medical opinion.[8]  The Sixth Circuit has specifically rejected such an argument, finding "the Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.' " *Rudd v. Comm'r of Soc. Sec.*, 531 Fed App'x 719, 728 (6th Cir. 2013).[9]    Further, Hoag does not raise either the ALJ's failure to evaluate the state doctors' reports or the alleged lack of a medical opinion underlying the RFC as issues in her appeal, but merely references them in her conclusion.  It is not

---

[7]     It is indisputable that, in his opinion, the ALJ failed to discuss the state doctors' reports or assign them weight in his opinion, as required by 20 C.F.R. § 404.1527 ("Regardless of its source, we will evaluate every medical opinion we receive.") However, the Court will not develop lines of argument the parties have merely referenced.  *See, infra* n. 10.

[8]     This assertion is also arguable since the ALJ drew his hypotheticals nearly verbatim from the state doctors' reports, making it clear he read and relied on them, although he failed to properly evaluate them.  He did, in addition, discuss and weigh medical opinions from a primary care physician and a pain management specialist who treated Hoag, though he determined they should be given little weight.  (Tr. 17.)

[9]     *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 Fed. App'x 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 Fed App'x 435, 442-443 (6th Cir. 2017).

the Court's obligation to make arguments on the parties' behalf.[10]

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: September 27, 2019

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

[10]    "In this circuit, it is well-settled that '[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995  96 (6th Cir. 1997)).